**UNITED STATES of America,
Appellee,**

v.

**Frederick SCHULTZ, Defendant–
Appellant.**

No. 02–1357.

United States Court of Appeals,
Second Circuit.

Argued March 10, 2003.

Decided June 25, 2003.

Paul Shechtman, New York City (Kathryn A. Meyers, Stillman & Friedman, New York City, of counsel), for Appellant.

Marcia R. Isaacson, Assistant United States Attorney, Southern District of New York, New York City (James B. Comey, United States Attorney for the Southern District of New York, Gary Stein, Assistant United States Attorney, Southern District of New York, New York City, of counsel), for Appellee.

Before: MESKILL, CARDAMONE and CABRANES, Circuit Judges.

MESKILL, Circuit Judge.

Defendant-appellant Frederick Schultz (Schultz) appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York, Rakoff, *J.*, after a trial by jury. Schultz was convicted of one count of conspiracy to receive stolen property that had been transported in interstate and foreign commerce, in violation of 18 U.S.C. § 371. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. Appellate jurisdiction is appropriate because "[w]e have jurisdiction to consider appeals from final decisions of the district courts, which are judgments of conviction and sentence in criminal cases." *United States v. Ferguson,* 246 F.3d 129, 138 (2d Cir.2001). *See also* 28 U.S.C. § 1291.

## BACKGROUND

Schultz was a successful art dealer in New York City. On July 16, 2001, he was indicted on one count of conspiring to receive stolen Egyptian antiquities that had been transported in interstate and foreign commerce, in violation of 18 U.S.C. § 371. The underlying substantive offense was violation of 18 U.S.C. § 2315, the National Stolen Property Act (NSPA).

Schultz moved to dismiss the indictment, asserting that the items he was charged

with conspiring to receive were not stolen within the meaning of the NSPA. Specifically, Schultz contended that the Egyptian antiquities he allegedly conspired to receive were not owned by anyone, and therefore could not be stolen. The prosecution asserted that the antiquities were owned by the Egyptian government pursuant to a patrimony law known as "Law 117" which declared all antiquities found in Egypt after 1983 to be the property of the Egyptian government. After an evidentiary hearing, the district court denied the motion to dismiss in a written memorandum and order. *See United States v. Schultz*, 178 F.Supp.2d 445 (S.D.N.Y.2002). Schultz was tried before a jury in January and February 2002.

The following facts were adduced at trial.

In 1991, Schultz met Jonathan Tokeley Parry (Parry), a British national, through a mutual friend. Parry showed Schultz a photograph of an ancient sculpture of the head of Pharaoh Amenhotep III, and told Schultz that he had obtained the sculpture in Egypt earlier that year from a man who represented himself to be a building contractor. Parry had used an Egyptian middle-man named Ali Farag (Farag) to facilitate the deal. Parry had smuggled the sculpture out of Egypt by coating it with plastic so that it would look like a cheap souvenir, then removed the plastic coating once the sculpture was in England.

Schultz offered Parry a substantial fee to serve as the agent for sale of the Amenhotep sculpture, which Parry accepted. Parry and Schultz discussed the problems that might arise if they were discovered to have the piece, and set out to create a false provenance for the sculpture, so that they could sell it. They decided that they would claim that the sculpture had been brought out of Egypt in the 1920s by a relative of Parry and kept in an English private collection since that time. Parry and Schultz invented a fictional collection, the "Thomas Alcock Collection," and represented to potential buyers that the sculpture came from this collection. With Schultz's knowledge, Parry prepared fake labels, designed to look as though they had been printed in the 1920s, and affixed the labels to the sculpture. Parry also restored the sculpture using a method popular in the 1920s.

Acting as Parry's agent, Schultz attempted to sell the Amenhotep sculpture to various parties, using the "Thomas Alcock Collection" story, but was unsuccessful. Eventually, Parry sold the sculpture to Schultz for $800,000, and Schultz sold it to a private collector in 1992 for $1.2 million. In June 1995, Robin Symes (Symes), who then owned the Amenhotep sculpture, asked Schultz to provide him with more details about the sculpture's origin, because he had learned that the Egyptian government was pursuing the sculpture. Schultz responded by asking questions regarding the Egyptian pursuit, but did not provide Symes with any additional information regarding the Amenhotep sculpture.

Parry and Schultz became partners, in a sense. They endeavored to bring more Egyptian antiquities into America for resale, smuggling them out of Egypt disguised as cheap souvenirs, assigning a false provenance to them, and restoring them with 1920s techniques. Parry testified about six items or groups of items, in addition to the Amenhotep sculpture, that he and Schultz attempted to remove from Egypt and sell under the false provenance of the Thomas Alcock Collection.

In 1991, Parry smuggled a sculpture of Meryet Anum (a daughter of Pharaoh Ramses II) out of Egypt and performed extensive restorations on it. Parry brought the sculpture to New York and

showed it to experts who determined it to be a fake.

In 1992, Parry sold Schultz a black top vase for $672, informing Schultz that the vase had been brought out of Egypt. Parry affixed a Thomas Alcock Collection label to the vase. Schultz and Parry acquired this vase because they believed that including some less valuable pieces in the imaginary Thomas Alcock Collection would make the Collection more believable.

In 1992, Parry wrote to Schultz from Egypt, telling Schultz that he had obtained a sculpture he called "The Offeror." Parry smuggled The Offeror out of Egypt and performed extensive restoration work on it. Parry believed the sculpture was authentic until testing revealed it to be a fake. Parry delivered The Offeror to Schultz without informing him of either the extensive restorations or the fact that the sculpture was not authentic. However, when Schultz discovered the sculpture was a fake, he returned it to Parry. Later, when Parry was arrested, The Offeror was confiscated by British authorities. Schultz contacted the authorities attempting to claim The Offeror as his own, eventually sending a forged invoice purporting to show that Schultz had bought the sculpture from a New York art dealer and had given it to Parry only for restoration. Schultz did not succeed in claiming The Offeror.

In 1992, Parry and Farag learned that someone had reported them to the Egyptian authorities for dealing in antiquities. Due in part to the assistance of Farag's father, who was a powerful Egyptian government official, Parry and Farag were able to get their names removed from police records by paying a bribe to certain corrupt members of the Egyptian antiquities police. These same corrupt police officers then entered into a deal with Parry and Farag, offering them a variety of antiquities in police possession in exchange for Parry and Farag paying off some debts owed by the police officers. Parry chose three items from the "bran tub"[1] full of items offered; he later sent those items to Schultz. Parry informed Schultz of how he had obtained the items. One of the items was marked with an Egyptian government registry number, which Parry succeeded in partially obliterating.

In 1992, Parry purchased the top half of a limestone sculpture of a striding figure, which he dubbed "George," from a group of Egyptian villagers. Apparently, when the sculpture had been found, it was in pieces, and the pieces were divided among rival groups of villagers. Parry wrote to Schultz telling him of the acquisition and informing Schultz that he was attempting to obtain George's bottom half. Parry also requested money to assist in the purchase of George and other items. Parry and Farag eventually succeeded in purchasing the bottom half of the sculpture, and reassembled the whole thing. Parry then coated George in plastic, and in plaster, and painted it to look like a tourist souvenir so it could be taken out of Egypt. Parry kept Schultz informed of his progress and eventually brought George to New York for Schultz to sell. When George was offered for sale, it was treated with 1920s restoration techniques and represented to be part of the Thomas Alcock Collection. Schultz was unable to sell George, and Parry requested that Schultz send George to Switzerland, where Parry planned to retrieve it. For reasons that are not clear from the record, Parry was not able to retrieve George.

In June 1994, Parry was arrested in Great Britain, and Farag was arrested in

---

1. A "bran tub" is a British term for a sort of "grab bag" selection of items.

Egypt. Each was charged with dealing in stolen antiquities. Schultz was aware of the arrests and communicated extensively with Parry after his arrest about Parry's legal situation. Parry and Schultz also continued to correspond regarding plans for new acquisitions.

In December 1994, Parry wrote to Schultz describing three limestone "stelae," or inscribed slabs, which had been discovered by builders in Egypt and were being offered for sale. Parry had an expert review photographs of the stelae, and the expert determined that the pieces were newly discovered and not listed in any of the catalogs of antiquities known to the Egyptian government. By 1995, there were ten pieces available from this find, and although Parry had been taken into custody in Great Britain, he continued attempting, with Schultz, to obtain the stelae. Schultz sent money for this purpose, and Parry directed that the pieces be shipped to Switzerland for Parry to retrieve in 1996. However, neither Parry nor Schultz ever actually obtained the stelae.

Throughout their partnership, Parry and Schultz communicated regularly; many of their letters were introduced in evidence by the government. Their letters indicate an awareness that there was a great legal risk in what they were doing. This awareness is reflected both in the content of the letters and in Parry's and Schultz's use of "veiled terms," code, or even languages other than English.

The jury found Schultz guilty on the sole count of the indictment, and on June 11, 2002, Schultz was sentenced principally to a term of 33 months' imprisonment. This appeal followed.

On appeal, the Court received three *amicus curiae* briefs. The National Association of Dealers in Ancient, Oriental & Primitive Art, Inc.; International Associa-

tion of Professional Numismatists; The Art Dealers Association of America; The Antique Tribal Art Dealers Association; The Professional Numismatists Guild; and The American Society of Appraisers filed a brief in support of Schultz. An *ad hoc* group called Citizens for a Balanced Policy with Regard to the Importation of Cultural Property, made up of politicians, academics, and art collectors, also filed a brief in support of Schultz. These briefs argue primarily that allowing Schultz's conviction to stand would threaten the ability of legitimate American collectors and sellers of antiquities to do business. The Archaeological Institute of America; The American Anthropological Association; The Society for American Archaeology; The Society for Historical Archaeology; and the United States Committee for the International Council on Monuments and Sites filed a brief in support of the United States. This brief argues primarily that sustaining Schultz's conviction and applying the NSPA to cases such as this one will help to protect archaeological and cultural sites around the world.

## DISCUSSION

### I. *Application of the NSPA to Cases Involving Patrimony Laws*

In order to preserve its cultural heritage, Egypt in 1983 enacted a "patrimony law" which declares all antiquities discovered after the enactment of the statute to be the property of the Egyptian government. The law provides for all antiquities privately owned prior to 1983 to be registered and recorded, and prohibits the removal of registered items from Egypt. The law makes private ownership or possession of antiquities found after 1983 illegal. Schultz's primary argument is that the NSPA does not apply to cases in which an object was "stolen" only in the sense

that it was possessed or disposed of by an individual in violation of a national patrimony law, as opposed to "stolen" in the commonly used sense of the word, for instance, where an object is taken from a museum or a private collection. The government contends that the plain language of the NSPA indicates that the NSPA applies to *any* stolen property, regardless of the source of the true owner's title in the property. The question, in other words, is whether an object is "stolen" within the meaning of the NSPA if it is an antiquity which was found in Egypt after 1983 and retained by an individual (and, in this case, removed from Egypt) without the Egyptian government's consent.

The NSPA reads, in pertinent part, as follows:

> Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more ... which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken ... [s]hall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 2315 (2000).

■ This statute is unambiguous. It applies to goods that are "stolen, unlawfully converted, or taken." *Id.* Goods that belong to a person or entity and are taken from that person or entity without its consent are "stolen" in every sense of that word. *See, e.g., Black's Law Dictionary* 989–90 (6th ed. abr.1991) (defining "stolen" as "[a]cquired or possessed, as a result of some wrongful or dishonest act or taking, whereby a person willfully obtains or retains possession of property which belongs to another, without or beyond any permission given, and with the intent to deprive the owner of the benefit of ownership (or

possession) permanently"); *Webster's Third New International Dictionary* 2248 (1971) (defining "stolen" as "obtained or accomplished by theft, stealth, or craft"). Accordingly, Schultz's actions violated the NSPA if the antiquities he conspired to receive in the United States belonged to someone who did not give consent for Schultz (or his agent) to take them. That "someone" is the nation of Egypt.

In 1983, Egypt enacted Law 117. The law, which is entitled "The Law on the Protection of Antiquities," reads, in pertinent part, as follows:

> **Article 1**
>
> An "Antiquity" is any movable or immovable property that is a product of any of the various civilizations or any of the arts, sciences, humanities and religions of the successive historical periods extending from prehistoric times down to a point one hundred years before the present, so long as it has either a value or importance archaeologically or historically that symbolizes one of the various civilizations that have been established in the land of Egypt or that has a historical relation to it, as well as human and animal remains from any such period.
>
> . . .
>
> **Article 6**
>
> All antiquities are considered to be public property—except for charitable and religious endowments.... It is impermissible to own, possess or dispose of antiquities except pursuant to the conditions set forth in this law and its implementing regulations.
>
> **Article 7**
>
> As of [1983], it is prohibited to trade in antiquities.
>
> . . .
>
> **Article 8**
>
> With the exception of antiquities whose ownership or possession was already es-

tablished [in 1983] or is established pursuant to [this law's] provisions, the possession of antiquities shall be prohibited as from [1983].

Law 117 includes a chapter entitled "Sanctions and Penalties" detailing the criminal penalties to be imposed on persons found to have violated the law. This section provides, *inter alia*, that a person who "unlawfully smuggles an antiquity outside the Republic or participates in such an act shall be liable to a prison term with hard labor and a fine of not less than 5,000 and not more than 50,000 pounds." A person who steals or conceals a state-owned antiquity faces a prison term of three to five years and a minimum fine of 3,000 pounds. A person who removes or detaches an antiquity from its place, counterfeits an antiquity, or unlawfully disposes of an antiquity faces a prison term of one to two years and a minimum fine of 100 pounds. A person who writes on, posts notices on, or accidentally defaces an antiquity faces a prison term of three to twelve months and/or a fine of 100 to 500 pounds.

Schultz moved in the district court to dismiss the indictment on the ground that Law 117 did not vest true ownership rights in the Egyptian government, and, accordingly, the items he conspired to smuggle out of Egypt were not "stolen" within the meaning of the NSPA. In response to Schultz's motion, the district court conducted an evidentiary hearing regarding Law 117 pursuant to Federal Rule of Criminal Procedure 26.1.[2] At that hearing, two Egyptian officials testified as fact witnesses for the government: Dr. Gaballa Ali Gaballa and General Ali El Sobky.

Dr. Gaballa is Secretary General of Egypt's Supreme Council of Antiquities, which is a part of the Ministry of Culture. The Supreme Council employs more than 20,000 people. Dr. Gaballa was asked: "Who owns all newly discovered antiquities?" He responded: "The Egyptian government, of course." Dr. Gaballa clarified that people who owned antiquities prior to the adoption of Law 117 in 1983 are permitted to continue to possess the antiquities, but they may not transfer, dispose of, or relocate the antiquities without notifying the Egyptian government. Dr. Gaballa testified that pursuant to Law 117, when the Egyptian government learns that an antiquity has been discovered, agents of the government immediately take possession of the item. The item is then registered and given a number.

In response to questioning by the court, Dr. Gaballa asserted that there are no circumstances under which a person who finds an antiquity in Egypt may keep the antiquity legally. The person who found the antiquity is not compensated for the item, because it never belonged to the finder. The only time compensation is paid is when a person owns a plot of land on which an immovable structure is located, and the government takes possession of the entire plot of land in order to possess the structure; in such a case, only the value of the land itself, and not the value of the structure, is taken into account in determining the amount of payment.

**2.** Rule 26.1 reads, in pertinent part, as follows: "Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence." Fed.R.Crim.P. 26.1 (2003). The Advisory Committee Note to this Rule specifically acknowledges that the Rule may be applicable where "[t]he content of foreign law may ... be relevant in proceedings arising under 18 U.S.C. §§ 1201, 2312 to 2317." Fed.R.Crim.P. 26.1 advisory committee's note.

The court also asked Dr. Gaballa whether Law 117 had been used to bring legal actions against persons in Egypt who did not comply with the law, but did not attempt to remove an antiquity from Egypt. Dr. Gaballa responded that he was aware of cases in which Law 117 had been applied to persons whose violations of the law took place entirely inside Egypt.

The government's second witness, General El Sobky, is the Director of Criminal Investigations for the Egyptian Antiquities Police. General El Sobky testified that his department, which employs more than 400 officers, regularly investigates and prosecutes people for violating Law 117. General El Sobky testified that most of the Law 117 investigations and prosecutions conducted by his department are of people who are trafficking in antiquities *within* Egypt, as opposed to exporting them out of Egypt. Furthermore, General El Sobky testified, even when a person is acquitted in such a prosecution, if the person is found to possess an antiquity, that antiquity is seized and retained by the government.

Schultz called one expert witness at the hearing, Khaled Abou El Fadl, a professor of Islamic and Middle Eastern law at the University of California—Los Angeles (UCLA) Law School. Professor Abou El Fadl opined that Law 117 was at times ambiguous and confusing. He further testified that the language of Law 117 did not make it clear whether the law "intended to keep the antiquities inside of Egypt or actually was asserting governmental ownership over the antiquities." Professor Abou El Fadl asserted that "nothing in Law 117 prevents the Antiquities Authority from leaving physical possession of even an antiquity discovered after 1983 in the hands of a private finder, so long as the private finder promptly notifies the Authority of his find."

On cross-examination, Professor Abou El Fadl stated that he had never practiced law in Egypt, nor was he licensed to practice law in Egypt. He testified that he had never read Law 117 prior to being requested to do so by Schultz's counsel, and that he had been unable to locate any treatises discussing Law 117.

Schultz contends that in spite of its plain language, Law 117 is not a "real" ownership law, and that Egypt does not truly claim ownership over all antiquities, but merely seeks to restrict their export. The district court disagreed, finding, based substantially on the testimony and other evidence presented at the hearing, that the plain language of Law 117 accurately reflects its purpose and effect: to vest absolute and true ownership of all antiquities found in Egypt after 1983 in the Egyptian government. *See Schultz*, 178 F.Supp.2d at 448.

"Issues of foreign law are questions of law," Fed.R.Crim.P. 26.1 (2003), and accordingly we review the district court's findings regarding Law 117 *de novo*. *See Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir.1998) ("[A] court's determination of foreign law is treated as a question of law, which is subject to *de novo* review." (citing parallel rule Fed.R.Civ.P. 44.1)).

Schultz failed to present any evidence at the hearing or at trial that Law 117 is not what its plain language indicates it is, that is, an ownership law. Professor Abou El Fadl's opinion that the law is ambiguous cannot overcome the combination of (1) the plain text of the statute, and (2) the testimony of two Egyptian government officials to the effect that the statute is a true ownership law and is enforced as such. Although Professor Abou El Fadl testified that he believed it would be *possible* for Egyptian authorities to leave antiquities in the possession of private individuals who discovered them, Schultz offered no evi-

dence that the authorities ever *actually* had *permitted* an individual to retain an antiquity found after 1983. The Egyptian government officials testified that there was no legal way for a private individual to retain possession of an antiquity discovered after 1983, and that all such antiquities are seized by the government.

Law 117 defines "antiquity" and prescribes the procedure to be followed by persons in possession of antiquities at the time the Law takes effect, and by persons who discover antiquities thereafter. It sets forth serious criminal penalties for the violation of its provisions. It provides for licensure of certain foreign archaeological missions, and for circumstances under which antiquities may be donated by the government to foreign museums in appreciation of those missions' work. The Law's provisions are directed at activities within Egypt as well as export of antiquities out of Egypt. Law 117 makes it clear that the Egyptian government claims ownership of all antiquities found in Egypt after 1983, and the government's active enforcement of its ownership rights confirms the intent of the Law. Accordingly, we conclude that Law 117 is clear and unambiguous, and that the antiquities that were the subject of the conspiracy in this case were owned by the Egyptian government.

The question thus becomes whether Schultz's actions in conspiring to take antiquities owned by the Egyptian government pursuant to Law 117 out of Egypt violate the NSPA. Schultz argues that even if Law 117 does intend to vest true ownership of all antiquities with the Egyptian government, that sort of "ownership" should not be recognized by the United States for purposes of prosecution under the NSPA.

Schultz urges us to adopt a narrow reading of the NSPA. However, the Supreme Court and this Court have acknowledged that the NSPA has a "broad purpose," *McElroy v. United States*, 455 U.S. 642, 655, 102 S.Ct. 1332, 71 L.Ed.2d 522 (1982), and that "the statute should be broadly construed." *United States v. Wallach*, 935 F.2d 445, 469 (2d Cir.1991) (citing *Moskal v. United States*, 498 U.S. 103, 113, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990)). We have held that the language of the NSPA "is broad enough to justify the federal courts in applying the statute whenever they determine that the [property was] stolen in another country." *United States v. Greco*, 298 F.2d 247, 251 (2d Cir.1962); *see also United States v. Parness*, 503 F.2d 430, 440 n. 14 (2d Cir.1974) (citing *Greco* with approval). Accordingly, there can be no doubt that if the antiquities involved in the conspiracy were stolen in Egypt and then shipped to the United States, the NSPA would be violated.

Just as the property need not be stolen in the United States to bring the NSPA into play, the fact that the rightful owner of the stolen property is foreign has no impact on a prosecution under the NSPA. *See United States v. Frazier*, 584 F.2d 790, 794 (6th Cir.1978) ("The court ruled that even if it were conceded that the defendants would be able to prove beyond a reasonable doubt that" the victim was a foreign company, the NSPA would still apply. "This was clearly a correct interpretation of the statute."). Furthermore, this Court has held that the NSPA applies to stolen property even where the person from whom the property was stolen may not have been the true owner of the property, and that the validity of the victim's title in the property is sometimes "irrelevant." *United States v. Benson*, 548 F.2d 42, 46 (2d Cir.1977).[3] Accordingly, it does

---

**3.** *Benson* involved a prosecution under a different section of the NSPA, 18 U.S.C. § 2314,

not matter that the antiquities at issue here were stolen in a foreign country, or that their putative owner is a foreign entity.

Notwithstanding all of the above, Schultz insists that the antiquities are not "stolen" within the meaning of the NSPA because they were never truly owned by the Egyptian government. The leading opinion addressing this question was issued by the Fifth Circuit, over 25 years ago, in *United States v. McClain*, 545 F.2d 988 (5th Cir.1977). The parties frame the question on appeal as whether the Second Circuit should adopt the reasoning set forth by the Fifth Circuit in *McClain*.

Schultz asserts that we should reject the holding in *McClain* based on existing Second Circuit precedent, which he reads as being hostile to *McClain*. Schultz then raises several additional arguments in support of his position, namely: (1) that *McClain*'s approach conflicts with United States policy, (2) that the enactment of the Convention on Cultural Property Implementation Act of 1983, 19 U.S.C. §§ 2601–2613 (CPIA), "confirms that Congress never intended [the] NSPA to reach ownership claims based upon national vesting laws when the property has not been reduced to the possession of the foreign state," and (3) that the common law definition of "stolen" would not reach the property at issue here. We address each of these arguments in turn.

### A. *McClain in the Second Circuit*

The *McClain* defendants were convicted of conspiring to violate the NSPA by importing artifacts from Mexico that were covered by a Mexican law declaring all such artifacts to be owned by the Mexican government. *See id.* at 992. The defendants claimed, as Schultz does here, that the NSPA did not apply to "stolen" objects that were taken in violation of patrimony laws. *See id.* at 994. The Fifth Circuit concluded that the NSPA did apply to such objects.[4] *See id.* at 996–97.

The *McClain* Court cited precedent according an expansive meaning to the term "stolen" in the NSPA, including *United States v. Handler*, 142 F.2d 351, 353 (2d Cir.1944), which held that embezzled property is "stolen" within the meaning of the NSPA. *See McClain*, 545 F.2d at 995 (citing cases). The *McClain* Court also cited *United States v. Bottone*, 365 F.2d 389, 393–94 (2d Cir.1966). In *Bottone*, the defendants photocopied documents detailing secret manufacturing processes, and transported the photocopies across state lines. *See Bottone*, 365 F.2d at 391. The original documents were taken from the rightful owner only briefly for copying, and were never transported in interstate or foreign commerce. *See id.* at 393. The Court found that the transport of the photocopies violated the NSPA, and the fact that the photocopies were "never possessed by the original owner should be deemed immaterial." *Id.* at 393–94.

The *McClain* Court also distinguished between mere unlawful export and actual theft, holding that "a declaration of national ownership is necessary before illegal exportation of an article can be considered theft, and the exported article considered 'stolen,' within the meaning of the [NSPA]." *McClain*, 545 F.2d at 1000–01.

---

which prohibits the *transport* of stolen property, as opposed to the *receipt* of stolen property, which is prohibited by § 2315. Our precedent interpreting § 2314 is persuasive in considering § 2315, as the two sections merely address different aspects of the same type of criminal behavior, namely dealing in stolen property, and both are part of the same legislative scheme.

**4.** The *McClain* Court reversed the convictions on other grounds. *See id.* at 1003.

The court engaged in a close study of the Mexican patrimony law, including its language, history and purpose, and concluded that the Mexican government had made a declaration of national ownership satisfying this standard. *See id.* at 997–1000. As discussed above, Egypt has made a clear declaration of national ownership through Law 117, and has enforced that law accordingly.

Summarizing its decision in *McClain*, the Fifth Circuit stated:

> This conclusion is a result of our attempt to reconcile the doctrine of strict construction of criminal statutes with the broad significance attached to the word "stolen" in the NSPA. Were the word to be so narrowly construed as to exclude coverage, for example, with respect to pre-Columbian artifacts illegally exported from Mexico after the effective date of the 1972 [patrimony] law, the Mexican government would be denied protection of the [NSPA] after it had done all it reasonably could do [to vest] itself with ownership to protect its interest in the artifacts. This would violate the apparent objective of Congress: the protection of owners of stolen property. If, on the other hand, an object were considered "stolen" merely because it was illegally exported, the meaning of the term "stolen" would be stretched beyond its conventional meaning. Although "stealing" is not a term of art, it is also not a word bereft of meaning. It should not be expanded at the government's will beyond the connotation depriving an owner of its rights in property conventionally called to mind.

*McClain*, 545 F.2d at 1001–02 (footnotes omitted). We agree that the Fifth Circuit reached the proper balance between these competing concerns in *McClain*.

### i. *Hollinshead*

Although *McClain* is often described as the only federal appeals court case to have considered the application of the NSPA to property deemed stolen under a foreign patrimony law, the issue was actually first encountered by the Ninth Circuit three years before *McClain* in *United States v. Hollinshead*, 495 F.2d 1154 (9th Cir.1974). The facts of *Hollinshead* are very similar to those in the case at hand. "Hollinshead, a dealer in pre-Columbian artifacts, arranged with one Alamilla, a co-conspirator, to procure such artifacts in Central America, and to finance Alamilla in doing so." *Id.* at 1155. Once the artifacts were obtained, they were shipped to Hollinshead in the United States. *See id.*

Hollinshead was convicted of conspiracy to transport stolen property in interstate and foreign commerce, in violation of 18 U.S.C. § 2314. *See id.* The trial centered on a particular artifact that had been found in a Mayan ruin in the jungle of Guatemala and eventually shipped to Hollinshead. *See id.* The artifact was "stolen" as defined by the NSPA because under Guatemalan law "all such artifacts are the property of the Republic, and may not be removed without permission of the government." *Id.* As occurred in this case, the district court had received testimony regarding the law of Guatemala as applied to such artifacts. *See id.*

The Ninth Circuit was not presented in *Hollinshead* with a direct attack on the application of the NSPA to cases involving patrimony laws; that was not the basis of the defendant's appeal. However, the Ninth Circuit's discussion indicates its acceptance of the prosecution's theory in *Hollinshead*: that an object is "stolen" within the meaning of the NSPA if it is taken in violation of a patrimony law. *See id.* at 1156. We are aware of no other

federal appeals court that has reached this issue.

The Second Circuit has rarely addressed *McClain*, and has never decided whether the holding of *McClain* is the law in this Circuit. *See United States v. Long Cove Seafood*, 582 F.2d 159, 163, 165 (2d Cir. 1978) (*Long Cove*); *United States v. An Antique Platter of Gold*, 184 F.3d 131, 134 (2d Cir.1999) (*Steinhardt*).[5] Although Schultz asserts that these cases support his position, we disagree with his interpretation of these precedents.

### ii. *Long Cove*

The defendants in *Long Cove* were charged with violating the NSPA by taking undersized clams from Long Island Sound and selling them to area restaurants. *See Long Cove*, 582 F.2d at 161, 162. There was no dispute that the practice of harvesting and selling undersized clams violated various environmental laws; the question was whether the transport of these clams across state lines constituted the interstate transport of "stolen" goods under the NSPA. *See id.* at 162–63. The government argued that the clams were "stolen" from the State of New York because of a New York law that provides:

> The State of New York owns all fish, game, wildlife, shellfish, crustacea and protected insects in the state, except those legally acquired and held in private ownership. Any person who kills, takes or possesses such fish, game, wildlife, shellfish, crustacea or protected insects thereby consents that title thereto shall remain in the state for the purpose of regulating and controlling their use and disposition.

*Id.* at 164 (quoting N.Y. Envtl. Conserv. Law § 11–0105).

The Court stated that the key question was "whether New York has asserted a true ownership interest in wildlife such as the Fifth Circuit, in [*McClain*], held that Mexico has done since 1972 with respect to pre-Columbian artifacts. We think not." *Id.* at 165. The Court emphasized that the New York statute stated that the purpose of asserting ownership was only to regulate and control the use and disposition of wildlife, not to actually take possession of it. *See id.* The Court further noted that while New York claimed to own the wildlife, it was not liable for an attack by any wild animal, as a private owner of such an animal would be. *See id.*

The distinctions between the facts of the *Long Cove* case and the facts of the case at hand are clear and require a different outcome here. First, as the testimony before the district court made clear, Egypt *does* assert a possessory interest in antiquities pursuant to Law 117. While the State of New York has never attempted to seize all wildlife found within its borders, Dr. Gaballa testified that the Egyptian government actively pursues any person found to have obtained an antiquity and takes immediate possession of all antiquities of which it becomes aware.

Second, both Dr. Gaballa and General El Sobky confirmed that the purpose of Law 117 is to bring all newly discovered antiquities within the direct possession and control of the Egyptian government in order to ensure that they are properly preserved and documented. Hundreds of antiquities police are employed by the Egyptian government solely to effectuate this purpose. To the contrary, the purpose of the New York law is simply to control the use and

---

**5.** We also cited to *McClain*, without discussion, in *United States v. Bennett*, 665 F.2d 16, 22 (2d Cir.1981).

disposition of wildlife. *See Long Cove*, 582 F.2d at 164–65.

Third, the New York law explicitly excepts those wildlife "legally acquired and held in private ownership." *Id.* at 164. Law 117 provides for *no exceptions* for private ownership of antiquities discovered after the effective date of the law.[6] It is legal under certain circumstances for a private person to obtain and dispose of wildlife in New York, for instance, by obtaining a hunting, fishing or trapping license. *See, e.g.*, N.Y. Envtl. Conserv. Law § 11–0701(4) (McKinney 2003) ("A fishing license entitles the holder to take fish by angling, spearing, hooking, longbow and tipups, to take frogs by spearing, catching with the hands or by use of a club or hook, and to take bait fish for personal use."). When a licensed hunter or fisherman catches wildlife in New York, it is his to keep and dispose of as he chooses.

In Egypt, on the other hand, it is impossible for a private party to get a license to obtain, possess or dispose of antiquities. Law 117 does provide in Article 34 for "foreign missions" to receive archaeological exploration and excavation licenses. However, Article 35 states that "[a]ll antiquities discovered by foreign archaeological excavation missions shall be state owned." If the Antiquities Authority determines that the foreign mission is "outstanding," and has performed "important excavation and restoration work," the Authority may reward the mission by donating certain antiquities which "are expendable by reason of their similarity to other items excavated from the same location." Even then, the donated antiquities must be "thoroughly examined and fully recorded," and may only be donated to a museum, not to the excavators themselves.

We also note that in *Long Cove* we were not called upon to rule directly on the application of the NSPA to property owned pursuant to a patrimony law, and we did not question the correctness of *McClain*. *Long Cove* cited *McClain* more than once, in a positive light, which is significant in light of the considerable publicity the Fifth Circuit's controversial holding in *McClain* had generated at the time. *See Long Cove*, 582 F.2d at 163, 165. These citations give no indication that the Court disapproved of the outcome or analysis of *McClain*.

### iii. *Steinhardt*

Schultz also contends that our decision in *Steinhardt* indicates that we have rejected the holding of *McClain*. In *Steinhardt*, the district court had found that an Italian antiquity should be forfeited by Steinhardt, who had imported it into the United States, because (1) Steinhardt had made material misrepresentations on a customs form or, (2) in the alternative, the

---

**6.** Law 117 does provide an exception for antiquities "whose ownership or possession was already established at the time th[e] law came into effect." Schultz argues that this provision renders Law 117 ambiguous, because it suggests that the Egyptian government does not truly intend to own *all* antiquities; we cannot agree. Schultz's expert, Professor Abou El Fadl, testified that Egypt has a constitutional provision which, like the United States Constitution, prohibits the taking of private property by the government without compensation. Providing an exception to the general rule of government ownership for those who already had legal possession of antiquities prior to the adoption of Law 117 avoids the problem of having to pay compensation to those private owners. Viewed in this light, the exception actually supports the government's position that Law 117 represents an effort to obtain true ownership and actual possession of all antiquities; if Law 117 were merely an export law, there would be no need to exempt existing owners, as their property rights would not be affected as long as they made no attempt to export their antiquities.

antiquity was properly owned by the Italian government pursuant to a patrimony law and was therefore stolen property within the meaning of the NSPA and subject to forfeiture. *See Steinhardt,* 184 F.3d at 134. On appeal, we concluded that Steinhardt had made a material misstatement on a customs form when he represented that the antiquity was from Switzerland, not Italy. *See id.* at 137. Accordingly, the Court concluded that the antiquity was subject to forfeiture.[7] *See id.* at 138. The Court declined to reach the alternative ground relied on below, stating: "We need not ... address whether the NSPA incorporates concepts of property such as those contained in the Italian patrimony laws." *Id.* at 134.

It is irrelevant that we previously reviewed a case in which it was not necessary to reach the question now before us. It is not at all uncommon for us to decline to reach an issue when the case before us can be resolved on other grounds. *See, e.g., Wexner v. First Manhattan Co.,* 902 F.2d 169, 174 (2d Cir.1990) ("[I]n light of our determination that the district court should be affirmed on other grounds, we find it neither necessary nor appropriate to reach this issue today."). Our failure to address a question that is not necessary to

the outcome of a case is simply a wise exercise of our discretion. *See United States v. United States Gypsum Co.,* 333 U.S. 364, 402, 68 S.Ct. 525, 92 L.Ed. 746 (1948) (Frankfurter, *J.,* concurring in part) ("Deliberate *dicta,* I had supposed, should be deliberately avoided. Especially should we avoid passing gratuitously on an important issue of public law where due consideration of it has been crowded out by complicated and elaborate issues that have to be decided.").[8] We find Schultz's reliance on *Steinhardt* unpersuasive.

**B. United States Policy**

Schultz contends that it is United States policy not to enforce the export restrictions of foreign nations. Schultz offers no evidence in support of this assertion, but even if his assessment of United States policy is accurate, the outcome of this case is unaffected. We have already concluded, based on the plain language of Law 117 and the evidence in the record, that Law 117 is an ownership law, not an export-restriction law. Two Egyptian officials testified under oath that the law is used in Egypt to prosecute people for trafficking in antiquities *within Egypt's borders.* Law 117 provides for a minimum five-year

---

7. *Steinhardt* involved the application of 18 U.S.C. § 545. As we explained:

> Section 545 prohibits the importation of merchandise into the United States "contrary to law" and states that material imported in such a manner "shall be forfeited." 18 U.S.C. § 545. The government claims that the importation of [the Italian antiquity] was illegal because it violated 18 U.S.C. § 542, which prohibits the making of false statements in the course of importing merchandise into the United States.

> *Steinhardt,* 184 F.3d at 134–35 (internal footnote omitted).

8. The dangers inherent in a court's reaching out to decide issues not essential to the outcome of the case before it were perhaps most colorfully described by the 19th century English jurist Lord Justice Bowen, who has been quoted by our Supreme Court as saying:

> I am extremely reluctant to decide anything except what is necessary for the special case, because I believe by long experience that judgments come with far more weight and gravity when they come upon points which the Judges are bound to decide, and I believe that obiter dicta, like the proverbial chickens of destiny, come home to roost sooner or later in a very uncomfortable way to the Judges who have uttered them, and are a great source of embarrassment in future cases.

> *Darr v. Burford,* 339 U.S. 200, 214, 70 S.Ct. 587, 94 L.Ed. 761 (1950), *overruled in part on other grounds by Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

prison term and a fine of 3,000 pounds for persons convicted of "[t]heft or concealment of a state owned antiquity." Persons convicted of smuggling an antiquity out of Egypt face "a prison term with hard labor and a fine of not less than 5,000 and not more than 50,000 pounds." Clearly, theft or concealment of an antiquity within Egypt is a different offense than smuggling an antiquity out of Egypt, and *both* are prohibited by Law 117. Accordingly, even if Schultz's interpretation of American policy is accurate, it is not relevant here. While Law 117 does restrict exportation of cultural objects, its scope is not limited to export restrictions. Law 117 is more than an export regulation—it is a true ownership law.

## C. *The CPIA*

Schultz contends that the adoption of the CPIA shows that Congress did not intend the NSPA to apply to objects such as the ones he conspired to bring to the United States. The CPIA implements a United Nations convention that was ratified by the United States in 1982, the purpose of which was to achieve "greater international cooperation towards preserving cultural treasures that not only are of importance to the nations whence they originate, but also to greater international understanding of our common heritage." S.Rep. No. 97–564, at 21 (1982).

The CPIA provides a mechanism for the American government to establish import restrictions on "cultural property" at the request of another signatory nation and after a determination by the President that (1) "the cultural patrimony of [the requesting nation] is in jeopardy from the pillage of archaeological or ethnological materials of [that nation]," (2) the requesting nation "has taken measures ... to protect its cultural patrimony," (3) the import restrictions are necessary and would be effective in dealing with the problem, and (4) the restrictions are in the "general interest of the international community." 19 U.S.C. § 2602(a)(1)(A)-(D) (2003).

Schultz argues that the CPIA was intended to be the only mechanism by which the United States government would deal with antiquities and other "cultural property" imported into the United States. However, nothing in the language of the CPIA supports that interpretation, and the legislative history shows that exactly the converse is true. As the district court correctly noted, *Schultz,* 178 F.Supp.2d at 449, the Senate Report on the CPIA expressly states that the CPIA "neither preempts state law in any way, nor modifies any Federal or State remedies that may pertain to articles to which [the CPIA's] provisions ... apply." S.Rep. No. 97–564, at 22 (1982). Furthermore, the Senate Report states that the CPIA "affects neither existing remedies available in state or federal courts nor laws prohibiting the theft and the knowing receipt and transportation of stolen property in interstate and foreign commerce (*e.g., National Stolen Property Act,* Title 18, U.S.C. Sections 2314–15)." *Id.* at 33 (emphasis added).

The CPIA also bars the importation of items that have been stolen from a museum or other cultural institution in a foreign signatory nation. *See* 19 U.S.C. § 2607. Schultz argues that because only those items that are stolen *from specified places* are covered by the CPIA, Congress never intended in any way to limit the import of items "stolen" only in the sense that they were taken in violation of patrimony laws. This argument is unpersuasive. The CPIA does not state that importing objects stolen from somewhere *other than* a museum is legal. If, for instance, an artifact covered by the CPIA were stolen from a private home in a signatory nation and imported into the United States, the CPIA

would not be violated, but surely the thief could be prosecuted for transporting stolen goods in violation of the NSPA.

■ The CPIA is an import law, not a criminal law; it is not codified in Title 18 ("Crimes and Criminal Procedure"), with the NSPA, but in Title 19 ("Customs Duties"). It may be true that there are cases in which a person will be violating both the CPIA and the NSPA when he imports an object into the United States. But it is not inappropriate for the same conduct to result in a person being subject to both civil penalties and criminal prosecution, and the potential overlap between the CPIA and the NSPA is no reason to limit the reach of the NSPA. *See, e.g., Hudson v. United States*, 522 U.S. 93, 98–99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (holding that a person may be subjected to civil and criminal penalties for the same conduct without violating the Double Jeopardy Clause).

For the reasons set forth above, we conclude that the passage of the CPIA does not limit the NSPA's application to antiquities stolen in foreign nations.[9]

### D. *Common Law Definition of "Stolen"*

■ Schultz argues that the Court must look to the common law definition of "stolen" to determine whether the antiquities

at issue are covered by the NSPA.[10] Schultz cites *United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), in which the Supreme Court considered the meaning of the term "stolen" in the context of the statute that served as the precursor and model for the NSPA. *See id.* at 410–11, 77 S.Ct. 397. The Supreme Court stated: "We recognize that where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." *Id.* at 411, 77 S.Ct. 397. Schultz contends that interpreting the NSPA to apply to items that are "stolen" in the sense that they are possessed by a defendant in violation of a foreign patrimony law would be in derogation of the common law. However, in *Turley*, the Supreme Court explicitly recognized that " 'stolen' (or 'stealing') has no accepted common-law meaning." *Id.* If "stolen" has no common law meaning, we cannot look to the common law to assist us in interpreting that term.

The Supreme Court also stated in *Turley* that the term "stolen" included "all felonious takings ... regardless of whether or not the theft constitutes common-law larceny." *Id.* at 417, 77 S.Ct. 397. In other words, according to the Supreme Court, the precursor to the NSPA—and by extension the NSPA—covers a broader

---

**9.** Schultz notes that Senator Moynihan stated, after the adoption of the CPIA, that part of the compromise reached in passing that law included an agreement to later amend the NSPA to overrule *McClain*. *See* 131 Cong. Rec. S2598–03 (Mar. 6, 1985). Senator Moynihan introduced legislation on two occasions which would have done just that; however, neither bill passed. Accordingly, although it may have been Senator Moynihan's belief that the Congress intended to overrule *McClain* in *separate legislation* after the adoption of the CPIA, that never actually happened. We note that this history further supports our holding that the CPIA itself did nothing to overrule

*McClain* or alter the effect of the NSPA with regard to foreign antiquities.

**10.** Schultz also argues that because a thing can only be "stolen" if it is already owned, then the term "ownership" is implied in the NSPA (although that word never appears anywhere in the text of the NSPA), and accordingly, we must determine the common law meaning of "ownership." We decline to accept this invitation to delve into the meaning of a term that is not even present in an unambiguous statute.

class of crimes than those contemplated by the common law. Accordingly, we find this argument unpersuasive.

#### E. *Summary*

In light of our own precedents and the plain language of the NSPA, we conclude that the NSPA applies to property that is stolen in violation of a foreign patrimony law. The CPIA is not the exclusive means of dealing with stolen artifacts and antiquities, and reading the NSPA to extend to such property does not conflict with United States policy. We believe that, when necessary, our courts are capable of evaluating foreign patrimony laws to determine whether their language and enforcement indicate that they are intended to assert true ownership of certain property, or merely to restrict the export of that property. In this case, the district court carefully evaluated the language of Law 117. The court also heard testimony from one academic expert and two Egyptian government officials. This evidence was sufficient to inform the court of the nature of Egypt's interest in the antiquities that were the subject of the conspiracy.

Although we recognize the concerns raised by Schultz and the *amici* about the risks that this holding poses to dealers in foreign antiquities, we cannot imagine that it "creates an insurmountable barrier to the lawful importation of cultural property into the United States." Our holding does assuredly create a barrier to the importation of cultural property owned by a foreign government. We see no reason that property stolen from a foreign sovereign should be treated any differently from property stolen from a foreign museum or private home. The *mens rea* requirement of the NSPA will protect innocent art dealers who unwittingly receive stolen goods, while our appropriately broad reading of the NSPA will protect the property of sovereign nations.

#### II. *Defense of Mistake of United States Law*

Schultz argues on appeal that the district court erred in refusing to allow him to present a defense of mistake of law. Specifically, Schultz sought to argue to the jury that he did not know that importing antiquities owned by the Egyptian government pursuant to Law 117 violated the NSPA.[11] The government contends that the district court was correct to bar this defense, relying on "the venerable principle that ignorance of the law generally is no defense to a criminal charge." *Ratzlaf v. United States,* 510 U.S. 135, 149, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994).

Schultz concedes that this is the general rule, but asserts that certain exceptions exist. Schultz cites three cases in which he contends that the Supreme Court found a defense of mistake of law was proper: *Ratzlaf,* 510 U.S. at 137, 114 S.Ct. 655 ("To establish that a defendant 'willfully violat[ed]' the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful."); *Cheek v. United States,* 498 U.S. 192, 200, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (interpreting "the statutory term 'willfully' as used in the federal criminal tax statutes as carving out an exception to the traditional rule" that mistake of law is no defense); and *Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) (reading food stamp fraud provision to include a requirement that the defendant knew that his actions were unlawful, where "to interpret the statute otherwise would be to criminalize a

---

**11.** This argument is referred to by the parties as the "mistake of American law defense." Schultz was permitted to present a "mistake of Egyptian law defense" to the jury.

broad range of apparently innocent conduct").

In addition, Schultz cites two federal appellate decisions from other circuits. In *United States v. Lizarraga–Lizarraga*, 541 F.2d 826 (9th Cir.1976), the Ninth Circuit reversed a defendant's conviction for illegal export of ammunition to Mexico because the district court had failed to instruct the jury that the defendant could be convicted only if he knew it was illegal to transport ammunition to Mexico. *See id.* at 828. Similarly, in *United States v. Grigsby*, 111 F.3d 806 (11th Cir.1997), the Eleventh Circuit reversed the conviction of a defendant for illegally importing elephant tusks because the district court had failed to instruct the jury that the defendant could be convicted only if he knew importing the items was illegal. *See id.* at 821, 834. Each of the cases relied on by Schultz is inapposite, for two reasons.

First, these decisions involve specific intent statutes. For instance, the statute at issue in *Lizarraga–Lizarraga* (now repealed) made it unlawful "willfully" to export certain items to Mexico. *See Lizarraga—Lizarraga*, 541 F.2d at 827. The inclusion of the term "willfully," the court found, made it clear that Congress intended to punish only those who exported ammunition knowing it was unlawful to do so. *See id.* at 828. Likewise, the statute of conviction in *Grigsby* specified that "[w]hoever *knowingly violates* section 4223 of this title" would be subject to criminal penalties. 16 U.S.C. § 4224 (2000) (emphasis added). The tax statute at issue in *Cheek* and the antistructuring statute at issue in *Ratzlaf* each also specified that only defendants who "willfully" violated the law would be subject to prosecution. *See* 26 U.S.C. §§ 7201, 7203; 31 U.S.C. § 5322.

The NSPA does not include the term "willfully." The section of the NSPA applicable to Schultz reads as follows:

> Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more ... which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, *knowing the same to have been stolen, unlawfully converted, or taken* ... [s]hall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 2315 (2000) (emphasis added). The *only* knowledge requirement in the NSPA is knowledge that the goods were "stolen, unlawfully converted, or taken." *Id.; see United States v. Rosa*, 17 F.3d 1531, 1546 (2d Cir.1994) (noting that the NSPA does not require knowledge that an item traveled in interstate or foreign commerce, but "does include a *mens rea* element with respect to the status of the goods as having been stolen"); *Godwin v. United States*, 687 F.2d 585, 588 (2d Cir. 1982) ("A violation of 18 U.S.C. § 2315 normally requires simply the act of receiving or disposing of stolen goods of the requisite value moving in interstate commerce, coupled with knowledge that the goods are stolen."). A defendant charged with violating the NSPA may argue that he did not know a certain *fact* that made his conduct criminal, that is, that he did not know the objects in question were stolen. Schultz's "mistake of Egyptian law" defense goes to that issue. However, if a jury finds that a defendant knew all of the relevant facts, the defendant cannot then escape liability by contending that he did not know the law.

Second, the cases cited by Schultz are inapposite because each concerns conduct that normally might not be considered unlawful. The *Lizarraga—Lizarraga* Court,

for instance, emphasized that in enacting the statute of conviction, Congress "did not intend to criminally penalize innocent or negligent errors." *Lizarraga—Lizarraga,* 541 F.2d at 828. The Supreme Court's primary concern in *Liparota* was that the statute under consideration in that case not be read in such a way as "to criminalize a broad range of apparently innocent conduct." *Liparota,* 471 U.S. at 426, 105 S.Ct. 2084.

In addition, the record demonstrates that Schultz's actions were not "innocent" or merely "negligent." This is not a case in which the defendant believed that he was doing something lawful, and was surprised to find that his conduct could result in criminal sanctions. To the contrary, Schultz was conspiring to *smuggle* antiquities out of Egypt and into the United States. He was defrauding (or attempting to defraud) potential buyers; the Thomas Alcock Collection story was invented by Schultz and Parry for the sole purpose of deceiving people as to the origin of the antiquities and when they had been taken out of Egypt. Schultz continued to do business in this manner even *after* his partners, Parry and Farag, had been arrested. Furthermore, Schultz and Parry demonstrated a keen awareness of the illegality of their actions by communicating in "code," forging documents, and even explicitly discussing the possibility that one or more of them might end up imprisoned.[12]

We conclude that the district court did not err in denying Schultz's request to present a defense of mistake of American law. The jury did not have to find that Schultz knew what he was doing was illegal. As long as the jury found beyond a reasonable doubt that Schultz knew the antiquities were "stolen," the jury, following the law, would have been required to convict Schultz even if it believed he had misunderstood American law.

### III. *Conscious Avoidance Jury Instruction*

■ Prior to Schultz's trial, the government requested that the court charge the jury on the doctrine of conscious avoidance, and submitted a proposed jury instruction on that issue. The district court included an instruction on conscious avoidance in its charge, which was provided to the parties prior to the charge conference, but the court's charge did not use the language suggested by the government. Schultz did not object to the use of a conscious avoidance charge or to the specific language proposed by the district court. On appeal, Schultz contends that the district court's instruction to the jury

12. The jury heard substantial evidence indicating that Schultz was actually aware that the NSPA had been applied to objects stolen in violation of a patrimony law. Specifically, it appears that Schultz was aware of the *McClain* decision.

In 1994, Schultz was contacted by the Turkish government. The Turkish government requested that Schultz detail the provenance of several items in his gallery that the Turkish authorities believed to be of Turkish origin. In this correspondence, the Turkish government noted that all antiquities found in Turkey are the property of the Turkish government under a patrimony law. Schultz, acting through counsel, refused to cooperate with Turkey in this inquiry, claimed that Schultz had no knowledge that any Turkish artifacts in his possession were stolen, and referred to the *McClain* case.

Schultz concedes in his appellate brief that the *McClain* decision was "well publicized." Schultz was an owner of a gallery dealing in antiquities, and was once the president of the National Association of Dealers in Ancient, Oriental and Primitive Art, suggesting that he would be aware of all significant developments in the field.

Accordingly, even if Schultz had been permitted to present this defense, it is unlikely that the jury would have credited it.

on the doctrine of conscious avoidance was erroneous.

### A. *Standard of Review*

"Because defendant did not object to the charge at trial, our review is for plain error." *United States v. Bala,* 236 F.3d 87, 94 (2d Cir.2000); *see also* Fed. R.Civ.P. 56(b). The parties agree that this is the proper standard of review.

> To establish plain error, a court must find 1) an error, 2) that is plain, 3) that affects substantial rights.... If an error meets these first three requirements, the Court engages in a fourth consideration: whether or not to exercise its discretion to correct the error. The plain error should be corrected only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Keigue,* 318 F.3d 437, 441–42 (2d Cir.2003) (internal citations and quotation marks omitted); *see also United States v. Gore,* 154 F.3d 34, 43 (2d Cir. 1998) ("A 'plain' error is an error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object."). Schultz "bears the burden of persuasion to show that the district court's charge amounts to plain error." *United States v. Vasquez,* 267 F.3d 79, 87 (2d Cir.2001).

"We do not review portions of [jury] instructions in isolation, but rather consider them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." *United States v. Weintraub,* 273 F.3d 139, 151 (2d Cir.2001).

### B. *The District Court's Instruction*

The district court charged the jury as follows:

[A] defendant may not purposefully remain ignorant of either the facts or the law in order to escape the consequences of the law. Therefore, if you find that the defendant, not by mere negligence or imprudence but as a matter of choice, consciously avoided learning what Egyptian law provided as to the ownership of Egyptian antiquities, you may [infer], if you wish, that he did so because he implicitly knew that there was a high probability that the law of Egypt invested ownership of these antiquities in the Egyptian government. You may treat such deliberate avoidance of positive knowledge as the equivalent of such knowledge, unless you find that the defendant actually believed that the antiquities were not the property of the Egyptian government.

Schultz argues, correctly, that the Second Circuit has "repeatedly emphasized that, in giving the conscious avoidance charge, the district judge should instruct the jury that knowledge of the existence of a particular fact is established (1) if a person is aware of a high probability of its existence, (2) unless he actually believes that it does not exist." *United States v. Feroz,* 848 F.2d 359, 360 (2d Cir.1988) (per curiam). In Schultz's estimation, the charge given by the district court failed to convey these essential points to the jury. The government concedes that the language of the charge did not precisely mirror the language set out in prior Second Circuit cases, but contends that the charge as given was sufficiently clear and contained all of the necessary elements.

We have stated before that "no jury instruction is ever perfect." *United States v. Joyner,* 313 F.3d 40, 47 (2d Cir.2002). We do not review a jury instruction to determine whether it precisely quotes language suggested by Supreme or Appellate Court precedent. Instead, we review the

court's instructions to determine whether "considered as a whole, [the instructions] adequately communicated [the essential] ideas to the jury." *United States v. Velez–Vasquez*, 116 F.3d 58, 61 (2d Cir.1997). "We cannot place the talismanic weight urged by [the defendant] on [the] exact wording [of a controlling opinion] and do not believe the district court needed to echo the opinion paragraph by paragraph to convey adequately its import to the jury." *United States v. Schatzle*, 901 F.2d 252, 255 (2d Cir.1990); *see also United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1196 (2d Cir.1989) (finding no error in conscious avoidance charge even though it "arguably" could have led the jury to draw an "unwarranted inference"); *United States v. McBride*, 786 F.2d 45, 51 (2d Cir.1986) (finding no error in conscious avoidance charge because "[t]he charge made reference to purposeful avoidance of the truth, awareness of a high probability of the fact at issue, and the absence of the defendant's actual belief in the nonexistence of the crucial fact"); *cf. DeFalco v. Bernas*, 244 F.3d 286, 312 n. 16 (2d Cir. 2001) (finding no plain error where, "[a]lthough the language of the jury instruction [was] not ideal," the charge as a whole did not reveal "an error 'so serious and flagrant that it goes to the very integrity of the trial,' or one that 'deprived the jury of adequate legal guidance to reach a rational decision'"); *Owen v. Thermatool Corp.*, 155 F.3d 137, 139 (2d Cir.1998) (finding no error in jury charge that failed to use the "more precise and more typical" phrasing set forth in precedent, because charge "adequately stated the law").

Here, the charge given by the district court adequately stated the law of con-scious avoidance. The court set forth both essentials required by *Feroz*. The charge informed the jury that it could find conscious avoidance only if it found *both* (1) that Schultz avoided gaining actual knowledge "because he implicitly knew that there was a high probability that the law of Egypt invested ownership of these antiquities in the Egyptian government" *and* (2) that Schultz did not "actually believe[ ] that the antiquities were not the property of the Egyptian government." The court also gave a "good faith" instruction and reiterated, immediately after giving the conscious avoidance charge, that Schultz could be found guilty only if the jury found that he had participated in the conspiracy "knowing that it contemplated the acquisition and/or sale of antiquities *that had been stolen from Egypt.*" (emphasis added).

It is true that the district court's instructions on this point could "have been more precise." *United States v. Bonito*, 57 F.3d 167, 174 (2d Cir.1995). "At trial, had objection been lodged to the imprecision, the judge would have been well advised to correct it. But on appeal, and in light of the charge as a whole, we see no error so obvious and seriously prejudicial to [the defendant's] substantial rights as to constitute plain error." *Id.* The instruction as given was sufficient to inform the jury of the law of conscious avoidance, and did not constitute plain error.[13]

IV. *Admission of Testimony of Witnesses Other than Schultz Regarding Their Personal Knowledge of Law 117*

■■■ Schultz contends that the district court erred in permitting the gov-

---

**13.** Even if the instruction were plain error, it is not at all clear that Schultz could meet his weighty burden of establishing that the error affected the outcome of the trial, in light of the sufficient evidence introduced to permit a rational jury to infer that Schultz had *actual* knowledge of Law 117. Furthermore, permitting Schultz's conviction to stand would not seriously affect the fairness or integrity of judicial proceedings.

ernment to elicit testimony from five witnesses—James Romano and Edna Russman, curators of the Brooklyn Museum of Art; Edmund Pillsbury, head of the Kimbell Museum; Blake Woodruff, a former employee of Schultz; and Betsy Bryan, a professor of Egyptology—regarding those witnesses' personal knowledge of Law 117. Schultz objected to this testimony in the district court; it appears that the basis for the objection was that the testimony was irrelevant. "The standard of review applicable to the evidentiary rulings of the district court is abuse of discretion." *Old Chief v. United States,* 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). "Unless a district court's determination of relevance is arbitrary or irrational, it will not be overturned." *Conway v. Icahn & Co.,* 16 F.3d 504, 511 (2d Cir. 1994).

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401 (2002). There is no dispute that the fact of Schultz's knowledge of Law 117 "is of consequence to the determination of the action" at hand. *Id.* The only question is whether the district court abused its discretion in determining that this testimony had "any tendency" to make that fact "more probable or less probable."

The government contends that this testimony was relevant to the question whether Schultz was aware of Law 117 because evidence that the Law was widely known among those in Schultz's field tended to make it more probable that Schultz, who

had worked in the field for decades, also knew about it. Furthermore, as the government emphasizes, each of the witnesses that was asked about his or her own knowledge of Law 117 had dealt *directly* with Schultz. Schultz had offered to sell "George" and the Amenhotep sculpture to James Romano and Edmund Pillsbury, respectively, using the Thomas Alcock Collection story. Schultz provided false information about the Amenhotep sculpture to Betsy Bryan, and showed "George" to Edna Russman, telling her it came from an old collection. Blake Woodruff had been employed by Schultz at Schultz's art gallery. The district court concluded that these witnesses' testimony tended to show that "even an ignoramus in this field would know at least about patrimony laws."

Schultz relies on *United States v. Patrisso,* 262 F.2d 194 (2d Cir.1958).[14] In *Patrisso,* one of the defendants, Mankes, was convicted of knowingly possessing stolen property, in part on the strength of evidence that the person who sold the goods to Mankes knew the goods were stolen. *See id.* at 195, 197. The Court reversed the conviction, finding that the evidence admitted regarding Mankes' codefendants' knowledge that the property was stolen was prejudicial to Mankes. *See id.* at 198. *Patrisso* is not on point, for at least three reasons.

First, *Patrisso* is not a relevance case. The Court never held that the evidence admitted was irrelevant as to Mankes, only that it was so prejudicial to him as to be inadmissible. *See id.* at 197. Here, the defendant has argued that the evidence was not admissible because it was irrelevant, not because it was prejudicial.

---

**14.** Schultz also relies on *Cheek* and *Liparota,* contending that because the Supreme Court never suggested that it would have been possible for the government to call witnesses to testify to their own knowledge of the facts at issue, such testimony is not permissible. This argument is without merit.

Second, the factual circumstances of the *Patrisso* case differed materially from those present here. In *Patrisso,* the Court noted that Mankes' behavior was not consistent with consciousness of guilt; he made no effort to conceal the stolen property. *See id.* at 198. As noted above, Schultz's behavior indicated a consciousness that his actions were illegal in some way. Mankes, however, was at least four steps removed from the actual theft: Patrisso obtained the property from the person who stole it and sold the property to Ellis; Ellis sold the property to Postrel; Postrel sold the property to Mankes. *See id.* at 196. Schultz, on the other hand, was actively involved in obtaining the antiquities, smuggling them out of Egypt, and disguising their true origins. The nature of the property at issue in *Patrisso*—television tubes—was not such that a person would naturally inquire about its source, whereas the evidence in this case established that persons considering purchasing Egyptian antiquities make extensive inquiries into the provenance of the antiquities.

Third, and most important, the type of knowledge at issue in *Patrisso* is materially different than the type of knowledge at issue here. Schultz was an acknowledged expert in the field of Egyptian antiquities, with many years of experience. It would have been natural for Schultz to know about Law 117. To the contrary, it would not have been natural for Mankes' co-defendants to tell him that the goods he was buying were stolen, and there was no other possible way for Mankes to have obtained that knowledge. Knowledge of a duly adopted, widely publicized, and vigorously enforced law such as Law 117 is quite different from knowledge of the specific theft of a specific product in *Patrisso.* Testimony from colleagues who worked with Schultz as to their own understanding of Egyptian law "was relevant both to explain the practice of the industry in which this prosecution arose and to establish what someone with [the defendant's] extended background in the industry probably would know." *United States v. Leo,* 941 F.2d 181, 197 (3d Cir.1991).

 "Evidence need not be conclusive in order to be relevant." *Contemporary Mission v. Famous Music Corp.,* 557 F.2d 918, 927 (2d Cir.1977). "Nonconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which make evidence less than conclusive affect only weight, not admissibility." *S.E.C. v. Singer,* 786 F.Supp. 1158, 1166 (S.D.N.Y.1992). Schultz's defense at trial was that he was unaware of the existence of Law 117. Evidence that those with whom Schultz dealt in the antiquities profession knew of Law 117, and particularly that Schultz's own employee knew of the Law, goes directly to the plausibility of Schultz's defense. "Determinations of relevance are entrusted to the sound discretion of the trial judge." *United States v. Quiroz,* 13 F.3d 505, 514 (2d Cir.1993). Here, we see no abuse of that discretion.

## CONCLUSION

 We conclude that the NSPA applies to property that is stolen from a foreign government, where that government asserts actual ownership of the property pursuant to a valid patrimony law. We find the remainder of Schultz's claims to be without merit. Accordingly, the judgment of the district court is hereby affirmed.